# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

DARYA DEARING, JANICE GULLICK, )
BOBBY T. TRESSEL, RICHARD A. )
HAYNES, NELSON SIEVERS, and )
LAUREN BROWN, individually and on )
behalf of all others similarly situated, )
                                     )
          Plaintiffs, )
                                     )   Case No. 1:20-cv-00574-WO-JEP
          v. )
                                       )
IQVIA, INC., THE BOARD OF )
DIRECTORS OF IQVIA HOLDINGS, )
INC., THE BENEFITS INVESTMENT )
COMMITTEE, and JOHN DOES 1-30. )

          Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS IQVIA INC.'S, THE BOARD OF DIRECTORS OF IQVIA
## HOLDINGS, INC.'S, AND THE BENEFITS INVESTMENT COMMITTEE'S
## <u>MOTION TO DISMISS THE COMPLAINT</u>

ACTIVE/104436440.14

## Table of Contents

NATURE OF THE MATTER BEFORE THE COURT ...................................................... 1

STATEMENT OF THE FACTS .................................................................................. 2

I.   The IQVIA 401(k) Plan. ...................................................................................... 2

II.  The Plan's Investment Offerings. ...................................................................... 3

III. The Plan's Investment Fees and Administrative Expenses. ................................ 5

IV.  Plaintiffs' Allegations. ...................................................................................... 6

QUESTIONS PRESENTED ...................................................................................... 7

ARGUMENT ........................................................................................................ 7

I.   Plaintiffs Do Not State a Loyalty Claim (Count I). .............................................. 8

II.  Plaintiffs Do Not State a Prudence Claim (Count I). ........................................... 9

   A.  The Only Plausible Inference Is That the Process Was Not Deficient. .............. 10

   B.  Plaintiffs' Specific Challenges Fail. .............................................................. 13

      1.  The Plan's Fees Are Well Within Acceptable Ranges. ................................ 13

      2.  Fidelity Freedom Funds Are the Most Widely Utilized Target-Date Funds. ...... 15

      3.  Plaintiffs' CIT and Share Class Allegations Cannot Support a Prudence Claim. 16

   C.  Defendants May Properly Offer Both Actively and Passively Managed Funds. ..... 19

III. Plaintiffs Do Not State a Monitoring Claim (Count II). ...................................... 22

CONCLUSION ................................................................................................... 23

Case 1:20-cv-00574-WO-JEP   Document 11   Filed 08/25/20   Page 2 of 29

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................... 7

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................... 7

*Cassell v. Vanderbilt Univ.*,
   285 F. Supp. 3d 1056 (M.D. Tenn. 2018) ........................................................... 8

*In re Constellation Energy Grp., Inc. ERISA Litig.*,
   738 F. Supp. 2d 602 (D. Md. 2010) ................................................................... 23

*DeFelice v. U.S. Airways, Inc.*,
   497 F.3d 410 (4th Cir. 2007) ....................................................................... 10, 15

*Divane v. Nw. Univ.*,
   2018 WL 2388118 (N.D. Ill. May 25, 2018) ........................................... 14, 20, 21

*Divane v. Nw. Univ.*,
   953 F.3d 980 (7th Cir. 2020) ....................................................................... 10, 18

*In re Duke Energy ERISA Litig.*,
   281 F. Supp. 2d 786 (W.D.N.C. 2003) ............................................................... 23

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
   2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019) ............................................... 8, 17

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) ............................................................................................... 7

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) ....................................................................... 14, 15

*Hecker v. Deere & Co.*,
   569 F.3d 708 (7th Cir. 2009) ............................................................................. 22

*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*,
   751 F.3d 740 (6th Cir. 2014) ............................................................................... 3

iii

*Laboy v. Bd. of Trus. of Bldg. Serv. 32 BJ SRP*,
    513 F. App'x 78 (2d Cir. 2013) ................................................................. 13

*Larson v. Allina Health Sys.*,
    350 F. Supp. 3d 780 (D. Minn. 2018) ...................................................... 17

*Leimkuehler v. Am. United Life Ins. Co.*,
    713 F.3d 905 (7th Cir. 2013) .............................................................. 5, 17

*Loomis v. Exelon*,
    658 F.3d 667 (7th Cir. 2011) .......................................................... 1, 4, 14

*Marks v. Trader Joe's Co.*,
    2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) ...................................... 17, 19

*Martin v. CareerBuilder, LLC*,
    2020 WL 3578022 (N.D. Ill. July 1, 2020) ................................. 8, 10, 17, 18

*Meiners v. Wells Fargo & Co.*,
    898 F.3d 820 (8th Cir. 2018) ................................................................. 21

*Obeslo v. Great-W. Capital Mgmt., LLC*,
    2020 WL 4558982 (D. Colo. Aug. 7, 2020) ............................................. 13

*Patterson v. Morgan Stanley*,
    2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ............................................ 8, 9

*Pension Benefit Guar. Corp. (PBGC) v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) ............................................................. 10, 22

*Philips v. Pitt Cnty. Mem'l Hosp.*,
    572 F.3d 176 (4th Cir. 2009) ............................................................ 2, 3, 7

*Ramos v. Banner Health*,
    2020 WL 2553705 (D. Colo. May 20, 2020) ........................................ 15, 16

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011) ............................................................. 14, 15

*Rinehart v. Akers*,
    722 F.3d 137 (2d Cir. 2013) ................................................................. 23

*Romero v. Nokia, Inc.*,
    2013 WL 5692324 (N.D. Cal. Oct. 15, 2013) .......................................... 22

iv

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
   2016 WL 7494320 (D. Conn. Dec. 30, 2016)............................................................. 18

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
   718 F. App'x 3 (2d Cir. 2017) ................................................................................... 8

*Sacerdote v. N.Y. Univ.*,
   2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017)..................................................... 17, 18

*Stewart v. Nat'l Shopmen Pension Fund*,
   795 F.2d 1079 (D.C. Cir. 1986) ................................................................................ 20

*Taylor v. United Techs. Corp.*,
   2009 WL 535779 (D. Conn. Mar. 3, 2009) ......................................................... 17, 20

*In re Unisys Sav. Plan Litig.*,
   74 F.3d 420 (3d Cir. 1996)........................................................................................ 15

*Veney v. Wyche*,
   293 F.3d 726 (4th Cir. 2002) ...................................................................................... 7

*In re Wells Fargo ERISA 401(k) Litig.*,
   331 F. Supp. 3d 868 (D. Minn. 2018).......................................................................... 8

*White v. Chevron Corp.*,
   2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ...................................................*passim*

*White v. Chevron Corp.*,
   2017 WL 2352137 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 452
   (9th Cir. 2018)............................................................................................................. 9

*Wildman v. Am. Century Servs. LLC*,
   362 F. Supp. 3d 685 (W.D. Mo. 2019) ...................................................................... 19

## STATUTES

ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B)...................................................... 10, 15

## OTHER AUTHORITIES

29 C.F.R. § 2550.404a-5.................................................................................................. 14, 19

Restatement (Third) of Trusts § 90 cmt. e(1) ...................................................................... 20

Restatement (Third) of Trusts § 100 .................................................................................... 20

## NATURE OF THE MATTER BEFORE THE COURT

Defendants IQVIA Inc. ("IQVIA"), the Board of Directors of IQVIA ("the Board"), and the IQVIA Benefits Investment Committee ("the Committee"), collectively "Defendants," submit this memorandum in support of their motion to dismiss Plaintiffs' complaint ("Complaint").

Plaintiffs' cookie-cutter complaint takes aim at a retirement plan that offers participants a mix of institutionally-priced mutual funds and alternative investments spanning a range of disciplines, and suggests from those entirely innocuous facts that Defendants somehow breached ERISA fiduciary duties by not caring about their employees or paying attention to the investments. The claims are utterly without merit. The IQVIA 401(k) Plan (the "Plan") includes the ***exact types of funds*** Plaintiffs say should have been offered—within a fee range (0.035-1.07%) that court after court has held to be perfectly acceptable, even on motions to dismiss. And the Plan's target-date funds, which draw the majority of Plaintiffs' criticisms, are the ***most widely-used*** target date funds offered today by large 401(k) plans. Against this backdrop, the law squarely rejects Plaintiffs' claims: it is more than appropriate for a retirement plan, like this one, to offer participants a choice of investments at varying price points, leaving "choice to the people who have the most interest in the outcome"—the participants. *Loomis v. Exelon*, 658 F.3d 667, 673-74 (7th Cir. 2011) (affirming dismissal).

Ultimately, Plaintiffs' claims fail because they offer no facts that plausibly show

Defendants engaged in a deficient process by making available to their participants perfectly acceptable and routinely used investment options. As such, Plaintiffs' Complaint should be dismissed with prejudice.

## STATEMENT OF THE FACTS

### I. The IQVIA 401(k) Plan.

Formed in October 2016 through the merger of IMS Health and Quintiles, IQVIA is a leading global provider of advanced analytics, technology solutions, and contract research services to the life sciences industry. 2018 Form 10-K at 3, 5 (Ex. A).

IQVIA offers its employees a vast array of generous benefits, including the option to participate in a 401(k) plan that allows employees to save for retirement on a tax-deferred basis. Compl. ¶¶ 39-41; *see also* Exs. B-C.[1] In 2014, the Plan held approximately $800 million in assets. Compl. ¶ 5. As a result of mergers and additional participant contributions, the Plan doubled to over $1.6 billion by 2018. *Id.*[2]

IQVIA has chosen to make additional contributions to participant accounts on top of what participants contribute. Compl. ¶¶ 28, 43-48; Ex. B. at 151, 207 (SPD). IQVIA makes a matching contribution equal to 100% of employees' contributions up to 3% of

---

[1] The Plan's Summary Plan Description ("SPD") and Investment Policy Statement ("IPS"), attached as Exhibits B-C, may be considered because they were incorporated by reference in the Complaint (¶¶ 25, 28, 30, 33-35, 43-44, 49), and are otherwise integral to Plaintiffs' claims. *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

[2] For the purposes of this motion, the Plan and its predecessor plan, the Quintiles 401(k) Plan, are collectively referred to as "the Plan." In the 2017, the IMS Health 401(k) Plan assets were transferred to the Quintiles 401(k) Plan, now known as the IQVIA 401(k) Plan. Compl. ¶¶ 1, 39 & n.3. The IMS Health 401(k) Plan is not at issue in this case. *Id.* n.2.

2

their compensation. Compl. ¶ 43. IQVIA then makes an additional contribution of 50%
of the next 3% of compensation contributed. *Id.* As a result, between 2014-2018, IQVIA
(and previously Quintiles) matched over $183 million of its employees' contributions.
*See* Schedule H, Part II of Exs. D, E, F, G, and H (2014-2018 Form 5500s).[3]

## II.    **The Plan's Investment Offerings.**

The Plan is participant-directed, meaning that each eligible employee that chooses
to participate can allocate the amounts credited to her account among the available
investment options. Compl. ¶¶ 39-41, 49. The Committee is charged with, among other
things, monitoring and evaluating the Plan's investment options, expenses, and fees. Ex.
C at 1-3. The Committee maintains detailed procedures and processes to guide the
selection and monitoring of and reporting on Plan investments, including their
performance and fees. *Id.* at 4-11. The Committee also retains an independent
investment consultant to advise the Plan. *Id.* at 4.

As stated in the Investment Policy Statement ("IPS"), "[t]he investment objective
of the Plan is to provide participants with an opportunity to create diversified portfolios
with varied aggregate risk and return characteristics." *Id.* at 2. The Committee otherwise
set out to include "both passively (indexed) and actively managed styles" that are
"suitable for and will appeal to the Plan's diverse participant base." *Id.* Consistent with

---

[3] The Plan's 2014-2018 Form 5500s (Exhibits D-H) are public records required to be
filed with the Department of Labor ("DOL"). *Hi-Lex Controls, Inc. v. Blue Cross Blue
Shield of Mich.*, 751 F.3d 740, 746 n.8 (6th Cir. 2014). Public records may be considered
on a motion to dismiss. *Philips*, 572 F.3d at 180. Form 5500s also may be considered
now because they were specifically cited and incorporated by reference in the Complaint
in ¶¶ 23, 40, 42, 45, 50-51, 53. *Id.*

those objectives, throughout the putative class period the Plan's options consisted of a broad array of 26-29 funds provided through the Plan's recordkeeper (Fidelity). *See* Schedule H to Exs. D-H (2014-2018 Form 5500s).

The Plan's funds—also known as "the Plan lineup"—included Fidelity Freedom target date funds, domestic and international funds, equity and fixed income funds, a money market fund, and five passively managed index funds. *See* Ex. C, IPS Ex. A. The lineup was not limited to mutual funds: it also included a collective investment trust ("CIT")—the Fidelity Contrafund Pool—and a separate account—the Bank of New York Mellon Stable Value Fund. *Id.*[4] When the Plan did use mutual funds, it used institutional—rather than retail—share classes of those funds, and only selected no-load funds. *See* Ex. C, IPS Ex. A; Ex. R.[5] The Plan also makes available a self-directed brokerage account through which participants can invest up to 100% of their account balance in an even larger universe of investment options, including low-fee index funds and thousands of other funds. *See* Ex. C at 6.

---

[4] A CIT is a pooled investment vehicle available only to certain investors, including qualified retirement plans, and is exempt from certain securities law disclosure and governance requirements. Ex. I, https://www.investopedia.com/terms/c/collective-investment-fund.asp. A separate account is a portfolio of assets managed by a professional investment firm that generally provides the investor direct ownership of the securities in the portfolio. Ex. P, https://www.investopedia.com/terms/s/separateaccount.asp.

[5] The Fidelity "K" Class funds are "institutional" class shares available only to institutional investors, like large 401(k) plans. *E.g.,* Ex. K, Fidelity Freedom 2030 Fund Class K Prospectus, at 11-12. Similarly, the Plans' other mutual fund offerings consist of institutional, not retail shares. *See* Ex. R; Ex. C, IPS Ex. A ("Institutional," "Admiral," and "R6" shares generally available only to 401(k) plans). No-load funds "do not charge investors a fee to buy or sell shares." *Loomis*, 658 F.3d at 669.

4

**III.** **The Plan's Investment Fees and Administrative Expenses.**

All retirement plans offer two types of services, each of which has costs:
(1) investment management; and (2) recordkeeping and other administrative functions.[6]

Investment management fees vary depending on how the particular investment is managed, and are set by the companies that offer or manage the fund. Ex. L at 3. Throughout the putative class period, the Plan's investment management fees (also known as expense ratios) ranged from approximately 0.035% to 1.07%. Ex. J at B8-B16.[7]

Recordkeeping and administrative fees include costs associated with recordkeepers, plan advisors, or other third-party service providers. Since 2015, the Plan's administrative and recordkeeping expenses have been paid by the Plan utilizing revenue sharing. Compl. ¶¶ 51, 100. Under this "commonplace" arrangement,[8] the revenue being "shared" is derived from a portion of the fees charged by certain funds in which plan participants are invested. *Id.* ¶ 100. The proceeds are then used by the plan sponsor to cover all costs necessary to administer the Plan. *See id.* Any remaining proceeds may then be used to pay qualified expenses at the sponsor's discretion. *See id.*

---

[6] U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1-3, 9 (Sept. 2019) (Ex. L).

[7] The Plan's fee disclosure, referenced in Complaint paragraph 105, is attached as Exhibit J.

[8] *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 908-09 (7th Cir. 2013) (a fund is "willing to pay some of [its] fees" to a recordkeeper "[b]ecause a portion of a [fund's] expense ratio is typically intended to cover the costs of providing the participant-level services that the [] fund would be furnishing if it were not for" the plan recordkeeper).

5

To the extent participants wished to invest their assets in lower-cost funds that did not offer revenue sharing, they were free to do so.  *See* Ex. C, IPS Ex. A.[9]

Plaintiffs do not challenge the actual amount of the Plan's recordkeeping or administrative costs.  Rather, they allege only that the Plan's investment fees were "excessive."  Compl. ¶¶ 130-31.

## IV.    **Plaintiffs' Allegations.**

Plaintiffs, six former employees of IQVIA and/or Quintiles, assert claims on behalf of "[a]ll persons … who were participants in or beneficiaries of the Plan, at any time between June 23, 2014 through the date of judgment."  Compl. ¶ 52.

In Count I, Plaintiffs allege that the Committee breached ERISA fiduciary duties of loyalty and prudence by causing the Plan to invest in funds that allegedly were "more expensive than the average or median institutional shares for that type of investment" and/or other available share classes of that investment.  Compl. ¶¶ 79, 127-33.  Count II alleges that IQVIA and the Board breached ERISA duties to monitor the Plan's costs and fiduciaries.  *Id.* ¶¶ 134-40.

The Complaint does not contain any allegations relating to the actual process utilized by Defendants to select or monitor the Plan's investments or the Committee.  Likewise, it contains no allegations regarding the performance of any of the Plan's investment options, nor any criticisms regarding the nature or value of the Plan's

---

[9] For example, the Plan offered a number of Vanguard index funds that did not share revenue.  *See* Ex. C, IPS Ex. A.

6

investment or recordkeeping services. Instead, Plaintiffs simply allege that the Plan's fees could have been lower.

## QUESTIONS PRESENTED

Whether the Complaint should be dismissed with prejudice because it fails to state a claim under ERISA.

## ARGUMENT

As the Supreme Court directed in *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014), motions to dismiss are a critical tool in "weeding out meritless [ERISA] claims." To avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint fails if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct...." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). To survive dismissal, a plaintiff must allege "more than labels and conclusions." *Twombly*, 550 U.S. at 555.

Under Rule 12(b)(6), a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. A court may consider documents incorporated by reference into the complaint, matters of public record, and documents attached to the motion to dismiss that are integral to the complaint and authentic. *Philips*, 572 F.3d at 180. Allegations need not be credited if they are contradicted by documents relied upon in the complaint or the public record. *See Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).

7

## I.    Plaintiffs Do Not State a Loyalty Claim (Count I).

To state a loyalty claim, a plaintiff "must do more than simply recast purported breaches of the duty of prudence as disloyal acts." *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 718 F. App'x 3, 7 (2d Cir. 2017) (affirming dismissal); *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, 2019 WL 4466714, *4 (S.D.N.Y. Sept. 18, 2019) (dismissing loyalty claims that "merely r[o]de the coattails of" and were "impermissibly intertwined with [plaintiffs'] prudence claims"). Rather, "a plaintiff must allege plausible facts supporting an inference that a fiduciary acted *for the purpose of* providing benefits to itself or some third party." *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1062 (M.D. Tenn. 2018) (emphasis in original); *see also Martin v. CareerBuilder, LLC*, 2020 WL 3578022, *6 (N.D. Ill. July 1, 2020) (dismissing complaint).[10] Simply alleging that a defendant's actions allowed a third-party to charge excessive fees—as the Complaint does (¶¶ 123-26)—is not enough to state a claim for disloyalty. *Patterson v. Morgan Stanley*, 2019 WL 4934834, *14 (S.D.N.Y. Oct. 7, 2019) (dismissing complaint).

Here, there is no nonconclusory allegation that the Committee put its own interests ahead of Plan participants. Instead, the allegations demonstrate that the Committee sought to promote participants' best interest. For example, Plaintiffs allege that the Committee generously matched nearly a third of employee contributions throughout the entire putative class period—*adding over $183 million to participant accounts*

---

[10] *See also In re Wells Fargo ERISA 401(k) Litig.*, 331 F. Supp. 3d 868, 875 (D. Minn. 2018), *aff'd*, 967 F.3d 767 (8th Cir. 2020) (a plaintiff must prove "the *reason* that a particular fiduciary" acted was to "further his own interests, rather than the interests of the fund participants") (emphasis in original).

8

*voluntarily*. Compl. ¶¶ 28, 43-48. Additionally, the Plan's IPS makes clear that the

Committee's governing principles put IQVIA employees first:

- the investment objectives are designed with the interests of IQVIA's "diverse participant base" in mind, and each investment is to be evaluated "in the best overall interests of Plan participants";

- the target date funds are selected based on the belief that "[s]ome Plan participants may benefit" from the investment manager's expertise and their asset allocation glide paths; and

- other asset classes "may ... be offered as the Committee deems in the best interests of participants."

Ex. C at 2, 5-6. Plaintiffs do not allege that Defendants violated the IPS, nor do they

offer any nonconclusory allegations to rebut these facts.

Plaintiffs' unsupported allegations (at ¶¶ 123-26) that the Committee put a third-

party's interests ahead of its own employees is implausible. *See White v. Chevron Corp.*,

2017 WL 2352137, *8-9 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 452 (9th Cir.

2018) (dismissing complaint); *Patterson*, 2019 WL 4934834, *14 (same).[11] Plaintiffs do

not allege any relationship between Defendants and the investment options they chose for

the Plan that would suggest a motive for favoring the providers over their own

participant-employees. Thus, Plaintiffs' loyalty claim must be dismissed.

## II.  __Plaintiffs Do Not State a Prudence Claim (Count I).__

Plaintiffs' prudence claim should be dismissed because the Complaint is bereft of

---

[11] To the extent Plaintiffs suggest (at ¶ 123) that Fidelity, the Plan's directed trustee, somehow selected or convinced the Committee to select higher-cost funds to "reap profits from the Plan," the allegation must be rejected because Fidelity did not have any decision-making authority to select investment options or evaluate fees. Ex. C at 3-4.

9

any facts or allegations that plausibly show the Committee had a deficient process for selecting investments.

### A.    The Only Plausible Inference Is That the Process Was Not Deficient.

ERISA's prudence standard is an objective, process-based standard that asks that fiduciaries engage in a prudent decisionmaking process and act "in a like capacity" as one "familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); *see also DeFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 420-21 (4th Cir. 2007).  To state a claim, Plaintiffs must allege "***nonconclusory*** factual content raising a ***plausible*** inference of misconduct [that] does not rely on 'the vantage point of hindsight.'"  *Pension Benefit Guar. Corp. (PBGC) v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (emphasis in original) (affirming dismissal); *see also  DeFelice*, 497 F.3d at 424.  The Court must dismiss speculative suits, "lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value."  *CareerBuilder*, 2020 WL 3578022, *5 (citing *Twombly*, 550 U.S. at 558); *see also Divane v. Nw. Univ.*, 953 F.3d 980, 988 (7th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678-79) ("[T]he notice-pleading rule 'does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.'"), *petition for cert. filed*, No. 19-1401 (June 19, 2020).

Here, Plaintiffs do not attempt to allege any facts showing a flawed decision-making process.  Instead, they allege only that imprudence can be inferred from the

10

Plan's investment options—*i.e.*, because the Plan used investments with supposedly higher relative fees than certain alternatives, the Committee must have been imprudent. The inference they seek does not follow from the pleaded facts and the documents referenced in their Complaint.

The Plan's IPS, adopted by the Committee, reflects a diligent, thoughtful process for making investment selections. *See* Ex. C. It sets forth "quantitative and qualitative processes and techniques" for selecting funds, including a review of a range of metrics such as: trailing one-, three-, five-, and ten-year returns; rolling 12-month returns (five years); rolling 36-month returns (ten years); Sharpe ratio (five years); up-market capture ratio (five years); down-market capture ratio (five years); style consistency to the appropriate index (R-Squared); and expense ratio. *Id*. at 6-7. These same criteria are used for on-going monitoring of investments, in "a regular and disciplined process" that "adheres to the principles of capital market theory, that maintain that over the long-term prudent investment risk taking is rewarded with incremental returns." *Id.* at 9. Funds that fall within the third quintile based on these quantitative criteria or other qualitative criteria (such as "manager changes, fund company reorganizations, strategy changes") are subject to Watch List for additional scrutiny. *Id.* "In addition to considering investment performance, the Committee will periodically review the Plan's investment and service provider's fees ... [t]o evaluate the reasonableness of fees in exchange for the services provided." *Id.* at 10.

11

Plaintiffs offer no nonconclusory facts that show, much less allege that, Defendants failed to abide by the IPS or the extensive and diligent processes the Committee established for itself. To the contrary, the Plan's public Form 5500 filings reflect that the Committee diligently monitored the Plan—removing and adding funds throughout the putative class period.[12] They also rebut Plaintiffs' specific allegations. For example, Plaintiffs challenge the Plan's failure to offer CITs (Compl. ¶¶ 85-102), yet the filings reflect that the Committee replaced the Fidelity Contrafund K mutual fund with a CIT. Ex. N. Similarly, Plaintiffs chastise the Committee's purported failure to include index fund options (Compl. ¶¶ 114-22), yet the filings reflect that the Plan offered at least five index funds throughout the putative class period, making changes to the index lineup and adding additional index options funds during the putative class period. *See* Ex. N.[13] In light of these incontrovertible facts, Plaintiffs' conclusory allegations are not only implausible—they are refuted. Thus, their claims should be dismissed. *See White v. Chevron Corp.*, 2016 WL 4502808, *14 (N.D. Cal. Aug. 29, 2016) (dismissing case where Form 5500s showed defendants switched funds during the class period, which "plausibly suggest[s] that defendants were monitoring" the plan).

---

[12] Exhibit N contains a list of the Plan's investment options at year end 2013-2019, as reflected in the Plan's publicly filed 2013-2018 Form 5500s and 2019 participant disclosure (referenced in the Complaint ¶ 105). *See* Exs. D-H, J. As the exhibit demonstrates, Defendants made a number of changes to the Plan lineup throughout the putative class period.

[13] The filings also show that the Committee added a self-directed brokerage account with additional low-cost options, including dozens of index funds, by 2017. *Compare* Ex. F, Schedule H (2016 Form 5500), *with* Ex. G, Schedule H (2017 Form 5500).

12

**B. Plaintiffs' Specific Challenges Fail.**

Notably, Plaintiffs do not criticize any of the Plan funds' investment performance or compare the fees in relation to "the services provided," as the IPS sets forth. Nor do they allege any facts that show the difference in fees with their pleaded comparators were not the result of differences in investment strategy or other added benefits (such as amounts allocated to cover recordkeeping costs). Rather, Plaintiffs simply assert that some, ***but not all***, of the Plan's funds were more expensive than others. For the reasons described below, Plaintiffs' claim must be dismissed.

### 1. The Plan's Fees Are Well Within Acceptable Ranges.

Plaintiffs allege that 60% of the Plan's funds had higher expense ratios than the "median expense ratio" for purportedly similar funds. Compl. ¶ 82. But as one court recently observed, the mere fact that a given mutual fund has higher expenses than "industry average fees" does not render the fees excessive. *Obeslo v. Great-W. Capital Mgmt., LLC*, 2020 WL 4558982, \*7 n.4 (D. Colo. Aug. 7, 2020). If that were the case, "half of all mutual funds would have 'excessive' fees." *Id.* Indeed, in a per curiam decision, the Second Circuit affirmed dismissal of an ERISA fee suit even where plaintiffs alleged that the plan utilized funds that "carried the second highest expense ratio" of comparator funds. *Laboy v. Bd. of Trus. of Bldg. Serv. 32 BJ SRP*, 513 F. App'x 78, 80 (2d Cir. 2013) (affirming dismissal).

Of course ERISA's prudence standard does not prohibit the use of half of the mutual funds in existence. Nor does it require ERISA fiduciaries "to scour the market to

13

find and offer the cheapest possible fund." *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (affirming dismissal); *Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011) (same).  As the principal regulator of retirement plans explains, "cheaper is not necessarily better."  Ex. L at 1, 9.  "[F]ees and expenses are only one of several factors" in making investment decisions and should not be considered "in a vacuum."  29 C.F.R. § 2550.404a-5(d)(1)(iv)(A)(4); Ex. L at 1-2, 9.  The DOL counsels fiduciaries to "[c]ompare the net returns relative to the risks among available investment options."  Ex. L at 9.  Yet the Complaint contains no allegations regarding the risks of any of the Plan funds, nor does it look at how the investments performed for the fees charged.  If it did, it would show that many of the purportedly more expensive funds outperformed their benchmarks at rates far outstripping any difference in fees.[14]  Nor does the Complaint address numerous other factors that the Plan's fiduciaries consider in selecting investment options that may impact a fund's investment fee.  Thus, as numerous courts have before, the Court should reject Plaintiffs' myopic fee claim and dismiss this case because it amounts to nothing more than an observation that "the fees could be lower." *E.g., Renfro*, 671 F.3d at 319; *Loomis*, 658 F.3d at 667; *Hecker*, 556 F.3d at 586; *White*, 2016 WL 4502808, *10.

The Court should also dismiss Plaintiffs' fee claim because the Plan funds' fees— ranging from 0.035-1.07% (Ex. J at B8-B16)—have been held reasonable as a matter of law for similarly-sized plans. *E.g., Divane v. Nw. Univ.*, 2018 WL 2388118, *8 (N.D. Ill.

---

[14] For example, the Plan's most expensive fund—the Columbia Acorn Fund (*see* Compl. ¶ 82)—outperformed its benchmark over 1-year, 5-year, and 10-years.  *See* Ex. J at B8.

14

May 25, 2018), *aff'd*, 953 F.3d 980 (7th Cir. 2020) (0.05-1.89% range reasonable); *Renfro*, 671 F.3d at 327 (0.10-1.21% range reasonable); *Hecker*, 556 F.3d at 586 (0.07% to "just over 1%" range prudent). As in those cases, the Plan lineup afforded participants the option of selecting inexpensive index funds with expense ratios ranging from 0.035%-0.05%. *See* Ex. J at B8-B16; Ex. N. Accordingly, Plaintiffs' allegations fail.

### 2. Fidelity Freedom Funds Are the Most Widely Utilized Target-Date Funds.

Plaintiffs' allegations concerning the Plan's use of the Fidelity Freedom Funds also fail to state a claim under ERISA's objective standard of prudence because they are widely utilized by similarly-situated fiduciaries.

As noted above (at 10), ERISA's prudence standard ***explicitly requires*** that fiduciaries act "in a like capacity" as one "familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). This standard is "objective." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434-35 (3d Cir. 1996); *DeFelice,* 497 F.3d at 420-21.

Here, the majority of Plaintiffs' challenges to the Plan lineup concern Fidelity Freedom Funds. Compl. ¶ 82 (10 of 17 funds Plaintiffs allege were too expensive are Freedom Funds); *id.* ¶ 91 (10 of 11 funds Plaintiffs allege should have been CITs are Freedom Funds); *id.* ¶ 118 (challenging the use of the Freedom Funds rather than index funds). Yet just a month before Plaintiffs filed suit, a court found that a large plan's offering (like this one) of Fidelity Freedom Funds was prudent as a matter of law. *Ramos v. Banner Health*, 2020 WL 2553705, *15-16 (D. Colo. May 20, 2020). Among other

15

things, the court determined that *four of the five most popular* target-date funds in 401(k) plans were Fidelity Freedom Funds. *Id.* "[F]rom 2009 until 2015, thousands of other 401(k) plans, and *at least 30 other large 401(k) plans* with more than $1 billion in assets ... offered the Fidelity Freedom Funds." *Id.* Because these facts were at odds with the claim that a prudent fiduciary would not have continued to offer Freedom Funds, the court granted judgment for defendants. *Id.*

The Court should hold the same here. While Plaintiffs would reflexively jettison the most widely used target date funds in the industry simply because they are not index funds, the Committee's evaluative standards are, consistent with ERISA, more exacting and probative—looking to "asset allocation and glide path," "the desired relationship of risk (or volatility) and potential return, and the needs and abilities of participants and beneficiaries," among other factors. Ex. C at 8. Against this backdrop, Plaintiffs cannot state a claim for a deficient process leading to use of the Freedom Funds.

            3.       <u>Plaintiffs' CIT and Share Class Allegations Cannot Support a Prudence Claim.</u>

Plaintiffs' CIT and share class-related allegations also do not state a claim for multiple reasons.

*First*, mutual funds and CITs are fundamentally different products. "[M]utual funds have unique regulatory and transparency features, which make any attempt to compare them to investment vehicles such as collective trusts and separate accounts an 'apples-to-oranges comparison.'" *White v. Chevron Corp.*, 2016 WL 4502808, *12. As such, courts routinely dismiss ERISA claims based on a plan's use of mutual funds

16

instead of CITs. *E.g.*, *id.; Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 795-96 (D. Minn. 2018); *Taylor v. United Techs. Corp.*, 2009 WL 535779, *10 (D. Conn. Mar. 3, 2009), *aff'd*, 354 F. App'x 525 (2d Cir. 2009).

*Second*, Plaintiffs' claims fail because the Plan *did* offer a CIT, in addition to a separate account and institutional share classes of funds. *Supra* at 4 & n.4, 5; Ex. C, IPS Ex. A; Exs. N & R.

*Third*, Plaintiffs' own source—the July 2016 ICI Economics of 401(k) Plans (cited at Compl. ¶ 74, and attached as Ex. O)—shows that 60% of all 401(k) plan assets at the time of the study were invested in mutual funds, rather than other types of investments (such as CITs). *Id.* at 2, 7.

*Fourth*, Plaintiffs' claim (at ¶¶ 103-13) that the Plan should have utilized certain lower-cost share classes fails because there is no obligation to utilize the cheapest share class of a mutual fund. *Leimkuehler*, 713 F.3d at 912 (affirming dismissal); *CareerBuilder*, 2020 WL 3578022, *4-5 (dismissing claims); *Marks v. Trader Joe's Co.*, 2020 WL 2504333, *7-8 (C.D. Cal. Apr. 24, 2020) (same); *Ferguson*, 2019 WL 4466714, *5-7 (same). As courts observe, there are a number of reasons that may cause a prudent fiduciary to pick a particular share class. *Sacerdote v. N.Y. Univ.*, 2017 WL 3701482, *11 (S.D.N.Y. Aug. 25, 2017); *White*, 2016 WL 4502808, *11. One of these reasons is that certain share classes can make revenue sharing payments to offset other plan costs. *CareerBuilder*, 2020 WL 3578022, *1. Thus, the use of "a higher-cost share class in [a plan] instead of an identified available lower-cost share class of the 'exact

17

same mutual fund option' ... does not constitute evidence of imprudence." *Sacerdote*, 2017 WL 3701482, *11; *White*, 2016 WL 4502808, *11. Rather, to state a plausible prudence claim Plaintiffs must allege ***specific facts*** indicating that the share class used by the Plan did not offer benefits that may have offset the additional cost. *CareerBuilder*, 2020 WL 3578022, *4-5.

*Fifth*, the Complaint identifies both a reason and a benefit for the use of share classes other than the lowest cost shares—to cover Plan recordkeeping and administrative expenses through revenue sharing. Compl. ¶¶ 103-06. For example, Plaintiffs' preferred K6 share class of Freedom Funds is alleged to be intended for plan sponsors ***who do not want to receive any revenue sharing***. *Id.* ¶ 103.

*Sixth*, to the extent Plaintiffs' CIT and share class allegations simply challenge the Plan's use of revenue sharing to cover plan administrative fees (Compl. ¶¶ 97-113), or suggest that in the abstract this is a method to "hide fees" (*id.* ¶ 99), they cannot succeed as a matter of law. "[C]ourts across the country have generally found that the practice of revenue-sharing does not, in principle, constitute an ERISA violation." *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 2016 WL 7494320, *10 (D. Conn. Dec. 30, 2016) (dismissing claims), *aff'd*, 718 F. App'x 3 (2d Cir. 2017). *See also Divane*, 953 F.3d at 990-91 (affirming dismissal). Moreover, the Complaint alleges no facts indicating that

18

the Plan's use of otherwise inexpensive institutional share class funds that offer revenue sharing has led to supposedly "devastating" "unchecked" fees. Compl. ¶ 99.[15]

*Seventh and finally*, in all events, as discussed above (at 15), the Plan funds' fees (between 0.035%–1.07%) still fell within a range held reasonable as a matter of law. To the extent Plaintiffs cite to a non-party marketing material that generally describes "hid[den] fees," such as loads (Compl. ¶ 99), the scare tactics are beside the point here. The Complaint contains no factual allegations, nor could it, about hidden fees here. All of the challenged funds were and remain no-load funds, *see supra* at 4, and Plaintiffs do not allege—nor could they—any breach of the DOL's detailed fee disclosure regulations found at 29 C.F.R. § 2550.404a-5. *See* Ex. J.

Accordingly, Plaintiffs' CIT and share class allegations should be dismissed.

## C. Defendants May Properly Offer Both Actively and Passively Managed Funds.

Plaintiffs' challenge (¶¶ 114-22) to the Plan's inclusion of actively managed investment options also fails.

---

[15] Plaintiffs allege, without any factual support, that "to the extent Defendants held revenue sharing amounts for a prolonged period of time and failed to remit any excess revenue sharing back to Plan participants," this would be a breach of duty. Compl. ¶ 102. But they have no factual support for this practice—nor could they. In any event, there is no legal obligation to rebate revenue sharing and it is not a breach to, instead, use the revenue to cover future Plan costs. *See Wildman v. Am. Century Servs. LLC*, 362 F. Supp. 3d 685, 693 (W.D. Mo. 2019) (finding that only 5-10% of retirement plans rebated revenue sharing to participants and granting judgment for defendants on all ERISA claims). Similarly, to the extent Plaintiffs allege the Plan's recordkeeping fees were excessive (*see* Compl. ¶ 130), the claim must be dismissed because the Complaint does not even allege what the recordkeeping fees were, much less what services the Plan received for those fees nor what a reasonable fee would be for those services. *See, e.g.*, *Marks*, 2020 WL 2504333, *5-6.

19

Courts repeatedly reject challenges to active offerings, particularly where, as here, Defendants gave participants a choice of both actively managed and index (passive) funds. *E.g., Divane*, 2018 WL 2388118, *6 ("[T]he mere fact that plaintiffs believe index funds are a better long-term investment ... does not a fiduciary breach make."); *Taylor*, 2009 WL 535779, *10. The law is clear: "Choices between reasonable alternatives ... are for the trustees, not the courts." *Stewart v. Nat'l Shopmen Pension Fund*, 795 F.2d 1079, 1083 (D.C. Cir. 1986). As such, a plan fiduciary can reasonably offer both active and passive funds. *Taylor*, 2009 WL 535779, *10. Although Plaintiffs rely on the Restatement (Third) of Trusts ("Restatement") § 100, for their attack on actively-managed funds (Compl. ¶ 114), they ignore that the Restatement explicitly allows for the use of active management, stating:

> The usual emphasis on long-term investing, however, does not prevent the use of active management strategies [which] are not prohibited as long as they are employed in a manner that is prudently designed to reduce the overall risk of the trust portfolio or to allow the trust, in appropriate circumstances, to achieve a higher return expectation without a disproportionate increase in the overall level of portfolio risk.

Restatement § 90 cmt. e(1).[16]

That is precisely what occurred here. The Committee determined that the Plan should include "both passively (indexed) and actively managed styles" that were "suitable for and will appeal to the Plan's diverse participant base," and that would

---

[16] This same commentary explains why Plaintiffs' challenge to the widely used Freedom Funds necessarily fails: "it is ordinarily helpful in justifying the reasonableness of a trustee's conduct to show that an investment or strategy is widely used by trustees in comparable trust situations." *Id.*

"employ a variety of non-correlated investment strategies" that "have sufficiently

different risk and return characteristics."  Ex. C at 2.  It provided a Plan lineup that

included a number of index funds, as well as target-date and other mixed asset portfolios,

domestic and international funds, equity and fixed income funds, a stable value fund, and

a money market fund.  *Supra* at 4.  To allow for further "diversification outside the

[Plan's] designated core investment options," the Plan also offered a self-directed

brokerage account with thousands of other investment options, including additional index

funds.  Ex. C at 6.  Participants, therefore, were free to choose from numerous passive

index options, as well as other funds offered in the Plan lineup or through the brokerage

window.  Plaintiffs' theory that they should not have been afforded such choice "is

paternalistic, but ERISA is not."  *Divane*, 2018 WL 2388118, *6.

To the extent Plaintiffs allege (at ¶¶ 118-19) that the Committee's selection of

actively-managed Freedom Funds instead of passive Freedom Index funds was the result

of an imprudent process, that claim also fails.  In addition to the reasons noted above (at

19) as to the prudence of selecting these funds, the Eight Circuit rejected a similar

comparison in *Meiners v. Wells Fargo & Co.*, 898 F.3d 820 (8th Cir. 2018).  In *Meiners*,

the court held that plaintiff's attempt to compare a target date fund with a less expensive

Vanguard target date index fund that had "some similarity" failed, in part, because the

funds had "different investment strategy[ies]."  898 F.3d at 823-24.  Similarly, here, the

prospectuses for the Freedom actively-managed and index funds show that each fund,

while similar, possessed different investment strategies—as demonstrated by their varying investment holdings.[17]

Further, regarding the selection of the target-date fund in particular, the Committee specifically determined in its IPS that "[s]ome Plan participants may benefit from the asset allocation expertise of investment professionals" managing the target date funds, as well as their asset allocation glide paths to assist participants as they approached retirement. Ex. C at 2, 5-6. Plaintiffs have not plausibly alleged that the decision to use the actively-managed Freedom Funds was made as a result of a flawed decision-making process. It is not enough to simply allege, as Plaintiffs do here, that a cheaper index fund product was available. *See PBGC*, 712 F.3d at 724-25; *Hecker v. Deere & Co.*, 569 F.3d 708, 710-11 (7th Cir. 2009).

For all the foregoing reasons, Count I should be dismissed.

## III. <u>Plaintiffs Do Not State a Monitoring Claim (Count II).</u>

Plaintiffs' derivative monitoring claim also fails and should be dismissed for two reasons. *First*, courts dismiss ERISA monitoring claims that fail to "present any specific facts regarding the monitoring process or how it was deficient." *Romero v. Nokia, Inc.*, 2013 WL 5692324, *5 (N.D. Cal. Oct. 15, 2013) (dismissing complaint). Here, Plaintiffs only offer conclusory allegations that no one monitored and evaluated the Plan's fiduciaries based only on the conclusory assertion of excessive fees. *See* Compl. ¶¶ 117, 138. Because the Complaint contains no specific facts regarding the monitoring process

---

[17] *Compare* Exs. K at 8-10, M at 8-10 (Fidelity Freedom Fund prospectuses), *with* Exs. S at 9-11, T at 9-11 (Fidelity Freedom Index Fund prospectuses).

or how it was deficient, it fails to sufficiently allege a monitoring claim. *Second*, Plaintiffs' monitoring claim is entirely derivative of their faulty prudence and loyalty claims. Because each underlying claim fails, the derivative monitoring claim also must be dismissed. *See In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 795 (W.D.N.C. 2003) (dismissing claim); *In re Constellation Energy Grp., Inc. ERISA Litig.*, 738 F. Supp. 2d 602, 614 (D. Md. 2010) (same).[18]

## CONCLUSION

For the foregoing reasons, the Court should dismiss the claims against Defendants with prejudice pursuant to Rule 12(b)(6).

*/s/ Justin N. Outling*
Justin N. Outling
NC State Bar No. 38409
Jennifer K. Van Zant
N.C. State Bar No. 21280
BROOKS, PIERCE, McLENDON,
HUMPHREY & LEONARD, L.L.P.
P.O. Box 26000
Greensboro, NC 27420
joutling@brookspierce.com
jvanzant@brookspierce.com
Phone: (336) 373-8850
Fax: (336) 232-9132

James O. Fleckner*
(*Special appearance pending*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
jfleckner@goodwinlaw.com
Phone: (617) 570-1000
Fax: (617) 523- 1231

Matthew L. Riffee*
(*Special appearance pending*)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, D.C 20036
mriffee@goodwinlaw.com
Phone: (202) 346-4000
Fax: (202) 346-4444

*Attorneys for Defendants*

---

[18] *See also White,* 2016 WL 4502808, *19; *Rinehart v. Akers*, 722 F.3d 137, 154 (2d Cir. 2013) (affirming dismissal), *vacated on other grounds*, 573 U.S. 956 (2014).

23

## LOCAL RULE 7.3(D) CERTIFICATION

I hereby certify that Defendants' Memorandum in Support of Their Motion to Dismiss the Complaint does not exceed 6,250 words.

*/s/ Justin N. Outling*
Justin N. Outling

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of August 2020, the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.

*/s/ Justin N. Outling*
Justin N. Outling