# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DARYA DEARING, JANICE GULLICK, BOBBY T. TRUSSEL, RICHARD A. HAYNES, NELSON SIEVERS, and LAUREN BROWN, Individually and as representatives of a class of similarly situated persons, on behalf of the IQVIA 401(K) PLAN,<br><br>               Plaintiffs,<br><br>   v.<br><br>IQVIA INC.; THE BOARD OF DIRECTORS OF IQVIA HOLDINGS, INC.; THE BENEFITS INVESTMENT COMMITTEE; and JOHN DOES No. 1-20, Whose Names Are Currently Unknown,<br><br>          Defendants. | Case No: 1:20-cv-00574-WO-JEP<br><br><br>**AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## I.      INTRODUCTION

1.     Plaintiffs, Darya Dearing ("Dearing"), Janice Gullick ("Gullick"), Bobby T.

Trussel ("Trussel"), Richard A. Haynes ("Haynes"), Nelson Sievers ("Sievers"), and Lauren

Brown ("Brown") (collectively, "Plaintiffs"), individually and as participants of the IQVIA

401(k) Plan ("Plan"), bring this action under 29 U.S.C. § 1132, on behalf of the Plan and a class

of similarly-situated participants and beneficiaries of the Plan, against Defendants, IQVIA Inc.

("IQVIA"), the Board of Directors of IQVIA Holdings, Inc. ("Board"), the Benefits Investment

Committee ("Administrative Committee" or "Committee"), and Does No. 1-20, who are

members of the Board or Administrative Committee or other fiduciaries of the Plan and whose

names are currently unknown (collectively, "Defendants") for breach of their fiduciary duties

under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and

related breaches of applicable law beginning six years from the date this action is filed and continuing to the date of judgment (the "Class Period").

2.      Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (i.e., 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment underperformance.

3.      The importance of defined contribution plans to the United States retirement system has become pronounced as employer-provided defined benefit plans have become increasingly rare as an offered and meaningful employee benefit.

4.      As of December 31, 2018, the Plan had 21,265 participants with account balances and assets totaling over $1.6 billion, placing it in the top 0.1% of all 401(k) plans by plan size.[1] Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of 401(k) plans and the investment of 401(k) assets. The marketplace for 401(k) retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5.      Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services.  Defendants are fiduciaries under ERISA, and, as such, are obligated to (a) act for the

---

[1]The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016 (pub. June 2019).

-2-

exclusive benefit of participants, (b) ensure that the investment options offered through the Plan are prudent and diverse, and (c) ensure that Plan expenses are fair and reasonable.

6.     Defendants have breached their fiduciary duties to the Plan and, as detailed below, have: (1) failed to fully disclose the expenses and risk of the Plan's investment options to participants; and (2) selected, retained, and/or otherwise ratified high-cost and poorly-performing investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time that they were chosen for inclusion within the Plan and throughout the Class Period (defined below).

7.     To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under ERISA Sections 404, 409 and 502, 29 U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class defined below (the "Class") as the Court may deem appropriate and just under all of the circumstances.

8.     Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

    a.     A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

    b.     A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

    c.     Equitable, legal or remedial relief for all losses and/or compensatory damages;

    d.     Attorneys' fees, costs and other recoverable expenses of litigation; and

e.    Such other and additional legal or equitable relief that the Court deems

appropriate and just under all of the circumstances.

## II.    THE PARTIES

9.    Dearing is a former employee of IQVIA and current participant in the Plan under

29 U.S.C. § 1002(7).  Dearing is a resident of Walled Lake, Michigan.

10.    Gullick is a former employee of IQVIA and current participant in the Plan under

29 U.S.C. § 1002(7).  Gullick is a resident of St. Petersburg, Florida.

11.    Trussel is a former employee of IQVIA and current participant in the Plan under

29 U.S.C. § 1002(7).  Trussel is a resident of Saltillo, Mississippi.

12.    Haynes is a former employee of IQVIA and former participant in the Plan under

29 U.S.C. § 1002(7).  Hayes is a resident of St. Petersburg, Florida.

13.    Sievers is a former employee of IQVIA and former participant in the Plan under

29 U.S.C. § 1002(7).  Sievers is a resident of Durham, North Carolina.

14.    Brown is a former employee of IQVIA and former participant in the Plan under

29 U.S.C. § 1002(7).  Brown is a resident of Bienville, Louisiana.

15.    IQVIA is a public Delaware corporation headquartered in Durham, North

Carolina.  IQVIA describes itself as "a leading global provider of advanced analytics, technology

solutions and contract research services to the life sciences industry."

16.    The Board appointed "authorized representatives" of IQVIA, including the

Administrative Committee, as plan fiduciaries.  Does No. 1-10 are members of the Board who

were/are fiduciaries of the Plan under ERISA pursuant to 29 U.S.C. §§ 1002(21)(A) because

each exercised discretionary authority to appoint and/or monitor the Administrative Committee,

-4-

which had control over Plan management and/or authority or control over management or disposition of Plan assets.

17.     The Administrative Committee is the Plan Administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Administrative Committee maintains its address at IQVIA's corporate headquarters in Durham, North Carolina.  The Administrative Committee and its members are appointed by IQVIA's Chief Executive Officer to administer the Plan on IQVIA's behalf.

18.     Does No. 11-20 are the members of the Administrative Committee and, by virtue of their membership, fiduciaries of the Plan or otherwise are fiduciaries to the Plan.  Plaintiffs are currently unable to determine the membership of the Administrative Committee or the identity of the other fiduciaries of the Plan because, despite reasonable and diligent efforts, it appears that the membership of the Administrative Committee and the identity of any other fiduciaries is not publicly available.  As such, these Defendants are named Does as placeholders.  Plaintiffs will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint to name the members of the Administrative Committee, the members of the Board, and other responsible individuals as defendants as soon as their identities are discovered.

### III.     JURISDICTION AND VENUE

19.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

21.     Venue is proper in this District pursuant to ERISA Section 502(e), 29 U.S.C. §

1332(e), and 28 U.S.C. § 1391 because IQVIA's principal place of business is in this District and

the Plan is administered from this judicial district.  Furthermore, a substantial part of the acts and

omissions giving rise to the claims asserted herein occurred in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     Background And Plan Structure

22.     "On May 3, 2016, Quintiles Transnational Holdings Inc. ("Quintiles") and IMS

Health Holdings, Inc. ("IMS Health") entered into an Agreement and Plan of Merger (the

"Merger Agreement")."[2]  Effective October 3, 2016, IMS Health merged with and into Quintiles,

with "Quintiles continuing as the surviving corporation," and the separate corporate existence of

IMS Health ceased (the "Merger").[3]  Immediately prior to the completion of the Merger,

"Quintiles converted to a Delaware corporation and changed its name to QuintilesIMS Holdings,

Inc."[4]  On November 6, 2017, QuintilesIMS Holdings, Inc. changed its name to IQVIA Holdings

Inc. with IQVIA Inc., being a wholly owned subsidiary.  Whether or not the IMS Health 401(k)

Plan was prudently managed and administered from 2014 to 2017 is not at issue in this

Complaint.

23.     IQVIA is the Plan sponsor.  From 2014 through 2016, Quintiles Transnational

Corp. was the Plan Sponsor of the Quintiles Transnational Corp. 401(k) Plan.  In 2016, IMS

Health Holdings, Inc. ("IMS Health") merged with and into Quintiles Transnational Holdings,

Inc., with QuintilesIMS Holdings, Inc. continuing as the surviving corporation.  After the

merger, the Plan sponsor changed to Quintiles, Inc. with the name of the plan changing to the

_____

[2]*IQVIA 2018 10-K at 3.*
[3]*Id.*
[4]*Id.*

Quintiles 401(k) Plan. In 2017, QuintilesIMS Holdings, Inc. changed its name to IQVIA

Holdings, Inc. with the Plan sponsor becoming IQVIA, Inc., and the plan name changing to the

IQVIA 401(k) Plan. IQVIA assumed liability for the prudent management and administration of

the Quintiles Transnational Corp. 401(k) Plan and the Quintiles 401(k) Plan as the surviving

corporation in the merger and as the successor in interest. Because IQVIA is ultimately the

surviving corporation of the merger, Quintiles Transnational Corp. and Quintiles, Inc. will be

referred to collectively throughout this Complaint as "IQVIA" and are considered collectively to

be the "Plan Sponsor."

24. The Plan is a participant-directed 401(k) plan, in which participants direct the

investment of their contributions into various investment options offered by the Plan. Each

participant's account is credited with the participant contributions, employer matching

contributions, any discretionary contributions, and earnings or losses thereon. The Plan pays

Plan expenses from Plan assets, and the majority of administrative expenses are paid by

participants as a reduction of investment income. Each participant's account is charged with the

amount of distributions taken and an allocation of administrative expenses. The available

investment options for participants of the Plan include various mutual funds and a collective

investment trust.

25. Mutual funds are publicly-traded investment vehicles consisting of a pool of

monetary contributions collected from many investors for the purpose of investing in a portfolio

of equities, bonds, and other securities. Mutual funds are operated by professional investment

advisers, who, like the mutual funds, are registered with the Securities and Exchange

Commission ("SEC"). Mutual funds are subject to SEC regulation, and are required to provide

certain investment and financial disclosures and information in the form of a prospectus.

26. Collective trusts are, in essence, mutual funds without the SEC regulation. Collective trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments. Collective trusts were first organized under state law in 1927 and were blamed for the market crash in 1929. As a result, collective trusts were severely restricted, giving rise to the more transparent and publicly-traded mutual funds. Today, banks create collective trusts only for their trust clients and for employee benefit plans, like the Plan. The main advantage of opting for a collective trust, rather than a mutual fund, is the negotiability of the fees, so that larger retirement plans should be able to leverage their size for lower fees.

27. During the Class Period, Plan assets were held in a trust by the Plan Trustee, Fidelity Management Trust Company. All investments and asset allocations are performed through this trust instrument.

B.     **Defendants' Breaches of Fiduciary Duties**

28. As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and/or loyalty to the Plan. Plaintiffs did not acquire actual knowledge regarding Defendants' breaches at issue here until shortly before this Complaint was filed.

1.     **The Plan's Investment in the Fidelity Freedom Funds**

29. Among other investments, the Plan lineup offers a suite of twelve target date funds. A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches. Target date funds offer investors dynamic, easy asset allocation, while providing both long-term growth and capital preservation. All target date funds are inherently actively managed, because managers make changes to the allocations to

stocks, bonds and cash over time. These allocation shifts are referred to as a fund's glide path. The underlying mutual funds that target date fund managers choose to represent each asset class can be actively or passively managed.

30.     According to the Plan's Form 5500s,[5] since at least December 31, 2009,[6] the Plan has offered the Fidelity Freedom fund target date suite. Fidelity Management & Research Company ("Fidelity") is the second largest target date fund provider by total assets. Among its several target date offerings, two of Fidelity's target date suites are the risky Freedom funds (the "Active suite") and the substantially less costly and less risky Freedom Index funds (the "Index suite"). Defendants were responsible for crafting the Plan lineup and could have chosen any of the target date families offered by Fidelity, or those of any other target date provider. Defendants failed to compare the Active and Index suites and consider their respective merits and features. A simple weighing of the benefits of the two suites indicates that the Index suite is a far superior option, and consequently the more appropriate choice for the Plan. Had Defendants carried out their responsibilities in a single-minded manner with an eye focused solely on the interests of the participants, they would have come to this conclusion and acted upon it. Instead, Defendants failed to act in the sole interest of Plan participants, and breached their fiduciary duty by imprudently selecting and retaining the Active suite.

31.     The two fund families have nearly identical names and share a management team.[7] But while the Active suite invests predominantly in actively managed Fidelity mutual

---

[5] The Form 5500 is the annual report that 401(k) plans are required to file pursuant to the reporting requirements of ERISA.
[6] The Form 5500 provides a detailed schedule of the Plan's holdings at the end of each calendar year. The suite of Fidelity Freedom funds appears as a Plan investment option as far back as the 2009 Form 5500, the earliest publicly available filing.
[7] Both target date suites have been managed by Brett Sumsion and Andrew Dierdorf since 2014. Finola McGuire Foley was added to the Index suite team in 2018.

funds,[8] the Index suite places no assets under active management, electing instead to invest in Fidelity funds that simply track market indices. The Active suite is also dramatically more expensive than the Index suite, and riskier in both its underlying holdings and its asset allocation strategy. Defendants' decision to add the Active suite over the Index suite, and their failure to replace the Active suite with the Index suite at any point during the Class Period, constitutes a glaring breach of their fiduciary duties.

32.     Exacerbating Defendants' imprudent choice to add and retain the Active suite is its role as the Plan's Qualified Default Investment Alternative ("QDIA"). A retirement plan can designate one of the investment offerings from its lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets; if participants do not direct where their assets should be invested, all contributions are automatically invested in the QDIA. Plan fiduciaries are responsible for the prudent selection and monitoring of an appropriate QDIA. The Fidelity Freedom fund with the target year that is closest to a participant's assumed retirement age (age 65) serves as the QDIA in the Plan.

33.     Given that the vast majority of plan participants are not sophisticated investors, many of the Plan participants, by default, concentrate their retirement assets in target date funds. As such, the impact of Defendants' imprudent selection of target date funds is magnified vis-à-vis other asset categories. Indeed, by December 31, 2018, approximately 54% of the Plan's assets were invested in the Active suite.

i.     The Active Suite is High-Risk and Unsuitable for Plan Participants

34.     The Active suite chases returns by taking levels of risk that render it unsuitable for the average retirement investor, including participants in the Plan, and particularly those

---

[8] Per Morningstar, the Active suite's underlying holdings are 88.8% actively managed, by asset weight.

whose savings were automatically invested through the QDIA. At first glance, the equity glide paths of the two fund families (meaning the Active suite and Index suite) appear nearly identical, which would suggest both target date options have a similar risk profile. However, the Active suite subjects its assets to significantly more risk than the Index suite, through multiple avenues. At the underlying fund level, where the Index suite invests only in index funds that track segments of the market, the Active suite primarily features funds with a manager deciding which securities to buy and sell, and in what quantities.

35. The goal of an active manager is to beat a benchmark—usually a market index or combination of indices—by taking on additional risk. Market research has indicated that investors should be very skeptical of an actively managed fund's ability to consistently outperform its index, which is a significant concern for long-term investors saving for retirement, like the Plan participants in this action. Actively managed funds tend to charge higher fees than index funds (which are passed on to the target date fund investor through higher expense ratios). These extra costs present an additional hurdle for active managers to clear in order to provide value and compensate investors for the added risk resulting from their decision-making. Indeed, Morningstar has repeatedly concluded that "in general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons."[9] Although they may experience success over shorter periods, active fund managers are rarely able to time the market efficiently and frequently enough to outperform the market. The Active suite's allocation to primarily actively managed funds subjects investor dollars to the decision-making skill and success, or lack thereof, of the underlying managers and the concomitant risk associated with these investments.

---

[9]"How Actively and Passively Managed Funds Performed: Year-End 2018";
https://www.morningstar.com/insights/2019/02/12/active-passive-funds.

36.     At all times across the glide path, the Active suite's top three domestic equity positions were and are in Fidelity Series funds (funds created for exclusive use in the Freedom funds), two of which have dramatically trailed their respective indices over their respective lifetimes. The Intrinsic Opportunities Fund, which is currently allocated 8.13% of the total assets in the 2040-2060 Funds, has, over its lifetime, missed its benchmark, the Russell 3000 Index, by an astonishing 326 basis points (3.26%) on an annualized basis. The Large Cap Stock Fund, which is currently allocated 7.11% of the total assets in the 2040-2060 Funds, has suffered even worse underperformance; its annualized lifetime returns trail that of its benchmark, the S&P 500 Index, by 357 basis points (3.57%). The portfolio of the Active suite is diversified among 32 underlying investment vehicles; the two aforementioned series funds represent over 15% of the 2040 through 2060 vintages, meaning for at least 20 years (because those target date funds have an associated target retirement date of at least twenty years from now), 15% of investor dollars are subject to the poor judgment exercised by just those two managers.

37.     Compounding the level of risk inherent in the Active suite's underlying holdings is the suite's managers' approach to portfolio construction and asset allocation decisions. Returning to the equity glide paths discussed above, the Active and Index suites appear to follow essentially the same strategy. The chart below shows the percentage of assets devoted to equities in each vintage.

| Equity Glide Path | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Years to Target Retirement Year | | | | | | | | | | | |
| Series | 40 | 35 | 30 | 25 | 20 | 15 | 10 | 5 | 0 | -5 | -10 | -15 | -20 |
| Fidelity Freedom | 90 | 90 | 90 | 90 | 89 | 78 | 65 | 58 | 53 | 43 | 35 | 24 | 24 |
| Fidelity Freedom Index | 90 | 90 | 90 | 90 | 90 | 80 | 65 | 59 | 52 | 43 | 34 | 24 | 24 |

This chart only considers the mix of the portfolio at the level of stocks, bonds and cash. A deeper examination of the sub-asset classes of the Active suite's portfolio, however, exposes the

-12-

significant risks its managers take to boost returns. Across the glide path, the Active suite allocates approximately 1.5% more of its assets to riskier international equities than the Index suite. The Active suite also has higher exposure to classes like emerging markets and high yield bonds.

38.     Since the Active suite series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by 10 percentage points in either direction. In a departure from the accepted wisdom that target date funds should maintain pre-set allocations, Fidelity encouraged its portfolio managers to attempt to time market shifts in order to locate underpriced securities, which the firm dubs "active asset allocation." This strategy heaps further unnecessary risk on investors, such as Plan participants, in the Active suite. A March 2018 Reuters special report[10] on the Fidelity Freedom funds (the "Reuters Report") details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk." The report quotes a member of Longfellow Advisors, who told Reuters that, after the 2014 changes, "it was not clear to us that [the managers of the Active suite] knew what they were doing." While many target date fund managers are increasing exposure to riskier investments in an effort to augment performance by taking on additional risk, the president of research firm, Target Date Solutions, states that the Active suite has gone further down this path than its peers.[11] Morningstar has noted in the past that active management has hindered the Active suite's performance, criticizing a previous poor decision to heavily weight to commodities. Morningstar similarly characterized Fidelity's shifts in the allocation of stocks between 1996 and 2010 as "shocking" and "seemingly chaotic." Yet,

---

[10]"Special Report: Fidelity puts 6 million savers on risky path to retirement", https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI.
[11]*Id.*

since 2014, a fund family with a history of poor decisions has been given "carte blanche" to take further risks, to the severe detriment of the Plan and its participants.

39.     This desire and latitude to assume more risk exposes investors in what Fidelity brands "a lifetime savings solution" to significant losses in the event of volatility similar to the downturn experienced during the COVID-19 epidemic.  Morningstar analyst Jeff Holt opines that the popularity of target date funds derives from investors' belief that the funds are designed to "not lose money."  As a result, the average unsophisticated investor, such as the typical participant in the Plan, tends to gravitate toward the all-in-one savings solution a target date fund offers.  Given this reality, Plan participants should be shielded from the riskiest fund families where active manager decisions could amplify losses in periods of market decline.  The Active suite's lack of downside protection has been magnified by the current COVID-19 crisis, and has been felt most sharply by Plan participants approaching their target date, because Plan participants close to retirement age do not have ample time to recoup significant losses before they start withdrawing their retirement savings.  The more conservative Fidelity Freedom Index 2020 Fund has handled the current volatility exceptionally, with year to date returns through August 11, 2020 ranking in the 19th percentile among other 2020 target date funds.[12]  In stark contrast, the Fidelity Freedom 2020 Fund (i.e., part of the Active suite), in which the Plan had approximately $142 million at the end of 2018, ranks in the 56th percentile among the same peer group.

### ii.     The Active Suite's Considerable Cost

40.     Even a minor increase in a fund's expense ratio (the total annual cost to an investor, expressed as a percentage of assets) can considerably reduce long-term retirement

---

[12]For Morningstar's peer group rankings, 1st percentile is the best performers.

savings. The fees charged by the Active suite are many multiples higher than the Index suite's industry-leading low costs. While the Institutional Premium share class for each target year of the Index suite charges a mere 8 basis points (0.08%), the K share class of the Active suite—which the Plan offers—has expense ratios ranging from 42 basis points (0.42%) to 65 basis points (0.65%).

| Cost Comparison | | | | | | |
|---|---|---|---|---|---|---|
| Freedom Suite | Ticker | Exp Rat | Freedom Index Suite | Ticker | Exp Rat | Difference |
| Income K | FNSHX | 0.42% | Income Inst Prem | FFGZX | 0.08% | -0.34% |
| 2010 K | FSNKX | 0.46% | 2010 Inst Prem | FFWTX | 0.08% | -0.38% |
| 2015 K | FSNLX | 0.49% | 2015 Inst Prem | FIWFX | 0.08% | -0.41% |
| 2020 K | FSNOX | 0.53% | 2020 Inst Prem | FIWTX | 0.08% | -0.45% |
| 2025 K | FSNPX | 0.56% | 2025 Inst Prem | FFEDX | 0.08% | -0.48% |
| 2030 K | FSNQX | 0.60% | 2030 Inst Prem | FFEGX | 0.08% | -0.52% |
| 2035 K | FSNUX | 0.63% | 2035 Inst Prem | FFEZX | 0.08% | -0.55% |
| 2040 K | FSNVX | 0.65% | 2040 Inst Prem | FFIZX | 0.08% | -0.57% |
| 2045 K | FSNZX | 0.65% | 2045 Inst Prem | FFOLX | 0.08% | -0.57% |
| 2050 K | FNSBX | 0.65% | 2050 Inst Prem | FFOPX | 0.08% | -0.57% |
| 2055 K | FNSDX | 0.65% | 2055 Inst Prem | FFLDX | 0.08% | -0.57% |
| 2060 K | FNSFX | 0.65% | 2060 Inst Prem | FFLEX | 0.08% | -0.57% |

41.     The higher fee, charged by the 2040 through 2060 Active funds, represents an annual cost to investors that is over eight times higher than what shareholders of the corresponding Index fund pay. The impact of such high fees on participant balances is aggravated by the effects of compounding, to the significant detriment of participants over time. This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



Portfolio Value From Investing $100,000 Over 20 Years

In 20 years, 0.50% annual fees reduce portfolio value (red line) by $10,000 compared to a portfolio with a 0.25% annual fee (blue line).

In 20 years, 1.00% annual fees reduce portfolio value (green line) by nearly $30,000, compared to a portfolio with a 0.25% annual fee (blue line).

—— 4% annual return less 0.25% annual fee
—— 4% annual return less 0.50% annual fee
—— 4% annual return less 1.00% annual fee

42.     Higher fees significantly reduce retirement account balances over time. Considering just the gap in expense ratios from the Plan's current investment in the Active suite to the Institutional Premium share class of the Index suite, in 2018 alone, the Plan could have saved approximately $4.57 million in costs. This tremendous cost difference goes straight into Fidelity's pockets and is paid for by Plan participants. As the costs for recordkeeping services have dropped precipitously over the past decade,[13] recordkeepers like Fidelity have been forced to chase profits elsewhere. The management fees derived from a plan's use of a provider's investment offerings substantially trump any compensation for recordkeeping services. Thus, Fidelity is heavily incentivized to promote its own investment products, specifically those that charge the highest fees, to each plan for which it recordkeeps, including the Plan.

---

[13]"NEPC: Corporate Defined Contribution Plans Report Flat Fees," https://www.nepc.com/press/nepc-corporate-defined-contribution-plans-report-flat-fees.

-16-

### iii. Investors Have Lost Faith in the Active Suite

43.     The flow of funds to, or from, target date families constitutes one indicator of the preferences of investors at large.  According to Morningstar's report on the 2019 Target Date Fund Landscape,[14] investor demand for low-cost target date options has skyrocketed in recent years.  Following suit, the Index suite has seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone.  At the same time, investor confidence in the Active suite has deteriorated; 2018 saw the series experience an estimated $5.4 billion in net outflows.  The movement of funds out of the Active suite has been substantial for years; the Reuters Report notes that nearly $16 billion has been withdrawn from the fund family over the prior four years.  Defendants' act, in offering and maintaining the Active suit in the Plan, evidences their failure to acknowledge, or act upon, investors' crumbling confidence in the Active suite, while ignoring the simultaneous and justified surge in faith in the Index suite.

### iv. The 5-Star Index Suite

44.     Morningstar assigns each mutual fund in its extensive database a star rating, which is a "purely mathematical measure that shows how well a fund's past returns have compensated shareholders for the amount of risk it has taken on."  This measurement emphatically favors the Index suite.  Each Fidelity Freedom Index fund bears a higher star rating than the corresponding Active fund (other than the Income and 2005 Index Funds, which have the same 3 stars as the Income and 2005 Active Funds).  With the exception of the Income, 2005, and 2060 iterations, the full Index suite is assigned 5 stars, Morningstar's highest rating.  The risk-adjusted returns of funds with a 5-star rating rank in the top 10% of their peers.  The Active suite does not achieve a single 5-star rating, and only receives one 4-star rating.  Defendants

---

[14]"2019 Target-Date Fund Landscape: Simplifying the Complex."

were likely aware, or should have been aware, of the higher ratings of the Index suite, yet continued to offer the Active suite, to the detriment of Plan participants.

| Morningstar Ratings | | | | | |
|---|---|---|---|---|---|
| Freedom Suite | Ticker | Stars | Freedom Index Suite | Ticker | Stars |
| Income K | FNSHX | 3 | Income Inst Prem | FFGZX | 3 |
| 2010 K | FSNKX | 3 | 2010 Inst Prem | FFWTX | 5 |
| 2015 K | FSNLX | 3 | 2015 Inst Prem | FIWFX | 5 |
| 2020 K | FSNOX | 4 | 2020 Inst Prem | FIWTX | 5 |
| 2025 K | FSNPX | 3 | 2025 Inst Prem | FFEDX | 5 |
| 2030 K | FSNQX | 3 | 2030 Inst Prem | FFEGX | 5 |
| 2035 K | FSNUX | 3 | 2035 Inst Prem | FFEZX | 5 |
| 2040 K | FSNVX | 3 | 2040 Inst Prem | FFIZX | 5 |
| 2045 K | FSNZX | 3 | 2045 Inst Prem | FFOLX | 5 |
| 2050 K | FNSBX | 3 | 2050 Inst Prem | FFOPX | 5 |
| 2055 K | FNSDX | 3 | 2055 Inst Prem | FFLDX | 5 |
| 2060 K | FNSFX | 3 | 2060 Inst Prem | FFLEX | 4 |

v.     The Active Suite's Inferior Performance

45.     In the period following the strategy overhaul in 2013 and 2014, the Active suite's higher levels of risk have failed to produce substantial outperformance when compared to the Index suite.  While assuming significantly higher levels of risk with investor dollars (and among them, the Plan participants' hard-earned savings), the Active suite has simply failed to measure up to the returns produced by its index cousin, in which the Plan participants' assets would be significantly better off.  Since the strategic changes took effect in 2014, the Index suite has outperformed the Active suite in four out of six calendar years.  Broadening the view to historical measures that encompass a period closer to a full market cycle, the Active suite has substantially underperformed the Index suite on a trailing three- and five-year annualized basis:

-18-

| 3-Year Trailing Performance as of 8/31/20 | | | | |
|---|---|---|---|---|
| Freedom Suite | Return | Freedom Index Suite | Return | Difference |
| Income K | 5.17% | Income Inst Prem | 5.81% | -0.64% |
| 2010 K | 6.26% | 2010 Inst Prem | 6.98% | -0.72% |
| 2015 K | 6.76% | 2015 Inst Prem | 7.58% | -0.82% |
| 2020 K | 7.15% | 2020 Inst Prem | 8.09% | -0.94% |
| 2025 K | 7.51% | 2025 Inst Prem | 8.46% | -0.95% |
| 2030 K | 8.07% | 2030 Inst Prem | 9.11% | -1.04% |
| 2035 K | 8.45% | 2035 Inst Prem | 9.61% | -1.16% |
| 2040 K | 8.49% | 2040 Inst Prem | 9.73% | -1.24% |
| 2045 K | 8.51% | 2045 Inst Prem | 9.73% | -1.22% |
| 2050 K | 8.50% | 2050 Inst Prem | 9.73% | -1.23% |
| 2055 K | 8.51% | 2055 Inst Prem | 9.74% | -1.23% |
| 2060 K | 8.50% | 2060 Inst Prem | 9.73% | -1.23% |

| 5-Year Trailing Performance as of 8/31/20 | | | | |
|---|---|---|---|---|
| Freedom Suite | Return | Freedom Index Suite | Return | Difference |
| Income K | 5.35% | Income Inst Prem | 5.25% | 0.10% |
| 2010 K | 6.86% | 2010 Inst Prem | 6.88% | -0.02% |
| 2015 K | 7.52% | 2015 Inst Prem | 7.64% | -0.12% |
| 2020 K | 8.01% | 2020 Inst Prem | 8.21% | -0.20% |
| 2025 K | 8.42% | 2025 Inst Prem | 8.71% | -0.29% |
| 2030 K | 9.27% | 2030 Inst Prem | 9.69% | -0.42% |
| 2035 K | 9.85% | 2035 Inst Prem | 10.38% | -0.53% |
| 2040 K | 9.89% | 2040 Inst Prem | 10.48% | -0.59% |
| 2045 K | 9.90% | 2045 Inst Prem | 10.48% | -0.58% |
| 2050 K | 9.89% | 2050 Inst Prem | 10.49% | -0.60% |
| 2055 K | 9.89% | 2055 Inst Prem | 10.48% | -0.59% |
| 2060 K | 9.87% | 2060 Inst Prem | 10.48% | -0.61% |

46.     It is unclear at what point in 2014 the Active suite's major strategic changes were implemented, but using a start date of January 1, June 30, or December 31, 2014, the Index suite has outperformed the Active suite to date.  Investing research and information websites commonly show the growth of $10,000 invested in a mutual fund and a benchmark over a period to provide a comparison of returns in a simple-to-understand format.  Using this method to compare the two suites, at each proposed start date, across every vintage of the fund families, the Index suite would have earned investors significantly greater sums on a $10,000 investment. Defendants breached their fiduciary duty to Plan participants by choosing to select and retain the

-19-

Active suite, thus causing Plan participants to miss out on greater investment returns for their retirement savings.

### 2.    The Plan's Objectively Imprudent Investment Options

47.    In addition to the Active suite, Defendants have saddled participants with additional objectively imprudent investment options.  It is a basic principle of investment theory that the risks associated with an investment must first be justified by its potential returns for that investment to be rational.  This principle applies even before considering the purpose of the investment and the needs of the investor, such as the retirement assets here.  The Capital Asset Pricing Model ("CAPM"), which is used for pricing securities and generating expected returns for assets given the risk of those assets and the cost of capital, provides a mathematical formula distilling this principle:

$ERi=Rf+\beta i(ERm-Rf)$, where:

$ERi$=expected return of investment
$Rf$=risk-free rate
$\beta i$=beta of the investment
($ERm-Rf$)=market risk premium

Applied here and put simply, the $\beta i$ is the risk associated with an actively-managed mutual fund or collective trust, which can only be justified if the $ERi$ of the investment option is, at the very least, above that of its benchmark, $Rf$.[15]  Otherwise, the model collapses, and it would be imprudent to assume any risk without achieving associated return above the benchmark returns.

### i.    The Columbia Acorn USA Fund

---

[15]In this instance, the index benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.

48.    The Columbia Acorn USA Fund Class Z has consistently and significantly underperformed its benchmark, the Russell 2000 Index, on both rolling 5-year and 10-year annualized bases:

**5-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | Russell 2000 Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 4Q2014 | 13.88% | 15.55% | -1.67% |
| 4Q2015 | 8.93% | 9.19% | -0.26% |
| 4Q2016 | 12.77% | 13.74% | -0.97% |
| 4Q2017 | 12.85% | 15.21% | -2.36% |



**10-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | Russell 2000 Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|

| 4Q2014 | 7.62% | 7.77% | -0.15% |
| 4Q2015 | 6.17% | 6.80% | -0.63% |
| 4Q2016 | 6.62% | 7.76% | -1.14% |
| 4Q2017 | 8.17% | 9.19% | -1.02% |



49.    When an investment option's track record is so apparently poor, as it is here, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark.  By way of example and to illustrate, there is a Vanguard Russell 2000 Index Fund that simply tracks the Russell 2000 Index, with a very low expense ratio of 8 basis points (0.08%).  While participants should have had the option to achieve the index's returns at minimal cost, Defendants' imprudence in retaining the Columbia Acorn USA Fund instead forced them to pay 116 basis points (1.16%) to consistently lag the index. Defendants' failure to replace this underachieving investment option with better performing alternatives was a breach of fiduciary duty.

-22-

ii. __The Prudential Jennison Mid Cap Growth Fund__

50.     The Prudential Jennison Mid Cap Growth Fund Class Q has also consistently and

significantly underperformed its benchmark, the Russell Mid-Cap Growth Index, for many

consecutive years:

__Annual Return v. Benchmark__

| Year | Performance, adjusted for investment expense | Russell Mid-Cap Growth Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|------|------|------|------|
| 2014 | 9.68% | 11.90% | -2.22% |
| 2015 | -2.24% | -0.20% | -2.04% |
| 2016 | 4.29% | 7.33% | -3.04% |
| 2017 | 22.88% | 25.27% | -2.39% |
| 2018 | -8.02% | -4.75% | -3.27% |



51.    Indeed, the fund's persistently performance is reflected in its rolling 5-year annualized returns, which have lagged the benchmark for as long as the Q share class has had 5-year data (since 2016):

**5-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | Russell Mid-Cap Growth Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 4Q2016 | 10.80% | 13.51% | -2.71% |
| 4Q2017 | 12.01% | 15.30% | -3.29% |
| 4Q2018 | 4.80% | 7.42% | -2.62% |



52.    The fund's dramatic underperformance has continued. While year-end 2019 trailing data is not available, the fund's 5-year annualized returns as of the end of the second quarter of 2020 lag the benchmark by an incredible 216 basis points (2.16%).

53.    Again, when an investment option's track record is so apparently poor, as it is here, Defendants should necessarily replace the fund in the Plan with an alternative that has

-24-

demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark. By way of example and to illustrate, there is a Fidelity Russell Mid Cap Growth Index Fund that simply tracks the Russell Mid-Cap Growth Index, with a very low expense ratio of 5 basis points (0.05%). While participants should have had the option to achieve the index's returns at minimal cost, Defendants' imprudence in retaining the Prudential Jennison Mid Cap Growth Fund instead forced them to pay 59 basis points (0.59%) to consistently lag the index. Defendants' failure to replace this underachieving investment option with better performing alternatives was a breach of fiduciary duty.

### 3. The Plan's Excessively Expensive Investment Menu

54.     In another obvious breach of their fiduciary duties, Defendants also failed to monitor the average expense ratios charged to similarly sized plans. Indeed, participants were offered an exceedingly expensive menu of investment options, clearly demonstrating that Defendants neglected to benchmark the cost of the Plan lineup or consider ways in which to lessen the fee burden on participants during the pertinent period. The majority of the funds in the Plan stayed relatively unchanged during the Class Period. In 2018, a majority of the funds in the Plan, at least 17 out of the Plan's 28 funds (61%), were substantially more expensive than comparable funds found in similarly sized plans (plans with over $1 billion in assets), according to the most recent Brightscope/ICI study published in August 2020:

| Fund | Expense Ratio | Category | ICI Average Fee |
|---|---|---|---|
| Fidelity Low Priced Stock K | 0.43% | Domestic Equity | 0.33% |
| Harbor Capital Appreciation Inst | 0.67% | Domestic Equity | 0.33% |
| Invesco Van Kampen Growth & Income R6 | 0.39% | Domestic Equity | 0.33% |
| Columbia Acorn USA Z | 1.16% | Domestic Equity | 0.33% |
| American Beacon Small Cap Value Inst | 0.83% | Domestic Equity | 0.33% |

-25-

| | | | |
|---|---|---|---|
| Prudential Jennison Mid Cap Growth Q | 0.59% | Domestic Equity | 0.33% |
| Fidelity Diversified International K | 0.63% | International Equity | 0.50% |
| Fidelity Freedom 2015 K | 0.49% | Target Date | 0.47% |
| Fidelity Freedom 2020 K | 0.53% | Target Date | 0.47% |
| Fidelity Freedom 2025 K | 0.56% | Target Date | 0.47% |
| Fidelity Freedom 2030 K | 0.60% | Target Date | 0.47% |
| Fidelity Freedom 2035 K | 0.63% | Target Date | 0.47% |
| Fidelity Freedom 2040 K | 0.65% | Target Date | 0.47% |
| Fidelity Freedom 2045 K | 0.65% | Target Date | 0.47% |
| Fidelity Freedom 2050 K | 0.65% | Target Date | 0.47% |
| Fidelity Freedom 2055 K | 0.65% | Target Date | 0.47% |
| Fidelity Freedom 2060 K | 0.65% | Target Date | 0.47% |

55. Indeed, from 2014 through 2018, the Plan paid out investment management fees of 0.48%-0.52% of its total assets, considerably more than those of comparable plans. According to the Brightscope/ICI study, the average total plan fees/cost is 0.28%[16] for the largest plans such as the Plan at issue in this case, with investment management fees comprising just one component of the total plan cost.[17] The fact that the investment management fees for the Plan alone were nearly double the average total plan cost (inclusive of all fees) confirms the plain fact that Defendants failed to ensure that the Plan was paying reasonable fees and committed an

---

[16]This figure is for 2017. Given technological advances and market-based competitive pressures since 2017, the average total plan cost should be even lower today.

[17]Total plan cost refers to the sum of all fees and expenses associated with the operation of a retirement plan; notably, the recordkeeping fees, any other administrative fees, and investment management fees. The total plan cost permits a straight "apples-to-apples" comparison of the total fees incurred by different plans, as service providers can and do manipulate price reporting by shifting or redirecting their fees to investment management expenses to minimize the billing for recordkeeping and other service components, and vice versa.

-26-

apparent and significant breach of their fiduciary duties by failing to ensure that the Plan only paid reasonable investment management fees. Of course, the fact that Defendants allowed such poor investments to be maintained in the Plan only compounded the injuries caused by such breaches.

56. A further indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select collective trusts where available. A prudent fiduciary conducting an impartial review of the Plan's investment lineup would have recognized that the Plan could have shaved off a portion of its excessive spend on investment management fees by converting the following funds to collective trusts:

| Fund | Expense Ratio | 2018 Plan AUM | Collective Trust Version | Inception Date | Expense Ratio |
|------|---------------|---------------|--------------------------|----------------|---------------|
| Fidelity Diversified International K | 0.63% | $43.0m | Fidelity Diversified International Commingled Pool | Dec. 13, 2013 | 0.58% |

57. During the Class Period, Defendants knew or should have known of the existence of these available collective trusts and therefore also should have immediately identified the prudence of transferring the Plan's substantial assets from the mutual funds into these alternative investment vehicles. The above collective trusts were comprised of the same underlying investments as their mutual fund counterparts, but charged lower fees. The Plan did not receive any additional services or benefits based on its use of the more expensive funds; the sole consequence was higher costs for participants. Defendants' failure to select the better-priced investment vehicle, or their inexplicable ignorance to the availability of collective trusts, was a severe breach of fiduciary duty.

58. Compounding this issue is Defendants' failure to monitor the Plan's investment options to ensure that they were in the least expensive available share class. There is no

distinction whatsoever, *other than price*, between the share classes for the same investment

option. The share class used is typically, if not always, dependent on the negotiating leverage of

the investor; in other words, large institutional investors, such as the Plan, have significant

amounts of monies to invest such that mutual fund managers will agree to lower fees/offer

cheaper share classes for access to those Plan assets. Despite the negotiating leverage based on

the size of the Plan, Defendants neglected to utilize the least expensive share class for the

following two funds:

| Fund | 2018 AUM | Exp Ratio | Cheaper Share Class | Exp Ratio |
|------|----------|-----------|---------------------|-----------|
| Harbor Capital Appreciation Inst | $82.7m | 0.67% | Harbor Capital Appreciation Retirement | 0.59% |

59. As long as Defendants continue to refrain from offering the least expensive share

class for each investment option in the Plan lineup, participants will suffer harm to their

retirement savings through the payment of needless extra fees. By failing to recognize that the

Plan and its participants were being paying higher investment management fees than they should

have been and/or failing to take effective remedial actions, Defendants breached their fiduciary

duties to the Plan.

## V.  ERISA'S FIDUCIARY STANDARDS

60. ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan
> solely in the interest of the participants and beneficiaries and -
>
> (A)    for the exclusive purpose of
>
>      (i)      providing benefits to participants and their
>              beneficiaries; and
>      (ii)     defraying reasonable expenses of administering the plan;

-28-

[and]

    (B)    with the care, skill, prudence, and diligence under the
        circumstances then prevailing that a prudent man acting in a like
        capacity and familiar with such matters would use in the conduct
        of an enterprise of like character and with like aims.

61.    Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in a plan and their beneficiaries and defraying reasonable expenses of administering the plan.

62.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

63.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants.

64.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. ERISA states, in relevant part, as follows:

    In addition to any liability which he may have under any other
    provision of this part, a fiduciary with respect to a plan shall be liable
    for a breach of fiduciary responsibility of another fiduciary with
    respect to the same plan in the following circumstances:

        (1)    if he participates knowingly in, or knowingly
                undertakes to conceal, an act or omission of such
                other fiduciary, knowing such act or omission is a
                breach; or

        (2)    if, by his failure to comply with section 404(a)(l) in
                the administration of his specific responsibilities
                which give risk to his status as a fiduciary, he has

-29-

enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

65.     29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.  Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.     CLASS ALLEGATIONS

66.     This action is brought as a class action by Plaintiffs on behalf of themselves and the following proposed Class:

> All participants and beneficiaries in the IQVIA 401(k) Plan (the "Plan") at any time on or after June 23, 2014 to the present (the "Class Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

67.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

68.     **Numerosity**.  Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

-30-

69.     **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

(a)     Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)     Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)     Whether and what form of relief should be afforded to Plaintiffs and the Class.

70.     **Typicality**.  Plaintiffs, who are members of the Class, have claims that are typical of all of the members of the Class.  Plaintiffs' claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

71.     **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

72.     **Potential Risks and Effects of Separate Actions**.  The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the

interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

73. **Predominance**. Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues. Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

74. **Superiority**. A class action is superior to all other feasible alternatives for the resolution of this matter. The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually. Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation. Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

75. **Manageability**. This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

76. Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above. Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or

-32-

restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

77. Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure. Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

78. Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3).

## COUNT I
### (For Breach of Fiduciary Duty)

79. Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

80. Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A), (B) and (D), 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan. In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

-33-

81.    To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

82.    As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

83.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)

84.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

85.    IQVIA is responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committee.

86.    In light of its appointment and supervisory authority, IQVIA had a fiduciary responsibility to monitor the performance of the Committee and its members.  In addition, IQVIA, and the Administrative Committee had a fiduciary responsibility to monitor the

-34-

performance of the members of the Committee.

87.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing

their fiduciary obligations, including those with respect to the investment and holding of Plan

assets, and must take prompt and effective action to protect the Plan and participants when they

are not.

88.    To the extent that fiduciary monitoring responsibilities of IQVIA or the

Committee was delegated, each Defendant's monitoring duty included an obligation to ensure

that any delegated tasks were being performed prudently and loyally.

89.    IQVIA and the Committee breached their fiduciary monitoring duties by, among

other things:

    (a)    Failing to monitor and evaluate the performance of their appointees or have a

    system in place for doing so, standing idly by as the Plan suffered enormous losses as

    a result of the appointees' imprudent actions and omissions with respect to the Plan;

    (b)    Failing to monitor their appointees' fiduciary processes, which would have alerted

    a prudent fiduciary to the breaches of fiduciary duties described herein, in clear

    violation of ERISA; and

    (c)    Failing to remove appointees whose performances were inadequate in that they

    continued to maintain imprudent, excessively costly, and poorly performing

    investments within the Plan, all to the detriment of the Plan and its participants'

    retirement savings.

90.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan

suffered substantial losses. Had IQVIA and the Committee discharged their fiduciary

monitoring duties prudently as described above, the losses suffered by the Plan would have been

-35-

minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duties alleged

herein, the Plan and its participants have lost millions of dollars of retirement savings.

91. IQVIA and the Committee are liable under 29 U.S.C. § 1109(a) to make good to

the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this

Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other

equitable or remedial relief as appropriate.

92. Each of the Defendants also knowingly participated in the breaches of the other

Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a

breach by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by

the other Defendants and failed to make any reasonable effort under the circumstances to remedy

the breaches. Defendants, thus, are liable for the losses caused by the breaches of their co-

fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### (In the Alternative, Liability for Knowing Breach of Trust)

93. Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint

as if fully set forth herein.

94. In the alternative, to the extent that any of the Defendants are not deemed a

fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise

subject to equitable relief as a non-fiduciary from further participating in a knowing breach of

trust.

95. To the extent any of the Defendants are not deemed to be fiduciaries and/or are

not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants

are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge

and information to avoid the fiduciary breaches at issue here and knowingly participated in

breaches of fiduciary duty by permitting the Plan to offer a menu of poor and expensive investment options that cannot be justified in light of the size of the Plan and other expenses of the Plan.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demand judgment against Defendants for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)     Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## **JURY DEMAND**

Plaintiffs demand a jury trial with respect to all claims so triable.

## **NOTICE PURSUANT TO ERISA § 502(h)**

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was

-37-

served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

DATED: September 25, 2020            /s/ Mark K. Gyandoh
                                           Mark K. Gyandoh
                                           Capozzi Adler, P.C.
                                           312 Old Lancaster Road
                                           Merion Station, PA 19066
                                           Telephone: (610) 890-0200
                                           Facsimile: (717) 233-4103
                                           Email: markg@capozziadler.com

                                           John Szymankiewicz
                                           127 West Hargett Street, Suite 100
                                           Raleigh, NC 27601
                                           Telephone: (919) 335-5291
                                           Facsimile: (919) 516-0686
                                           john@mathesonlawoffice.com

                                           James C. Shah
                                           Michael P. Ols
                                           Alec J. Berin
                                           Shepherd Finkelman Miller & Shah, LLP
                                         1845 Walnut Street, Suite 806
                                         Philadelphia, PA 19103
                                         Telephone: (610) 891-9880
                                         Facsimile: (866) 300-7367
                                         Email: jshah@sfmslaw.com
                                         mols@sfmslaw.com
                                         aberin@sfmslaw.com

                                           James E. Miller
                                           Laurie Rubinow
                                         Shepherd Finkelman Miller & Shah, LLP
                                         65 Main Street
                                         Chester, CT 06412
                                         Telephone: (860) 526-1100
                                         Facsimile: (866) 300-7367
                                         Email: jmiller@sfmslaw.com
                                               lrubinow@sfmslaw.com

-38-

Kolin C. Tang
Shepherd Finkelman Miller & Shah, LLP
1401 Dove Street, Suite 510
Newport Beach, CA 92660
Telephone: (323) 510-4060
Facsimile: (866) 300-7367
Email: ktang@sfmslaw.com

Donald R. Reavey
Capozzi Adler, P.C.
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101
Facsimile: (717) 233-4103
Email: donr@capozziadler.com

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2020 a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: /s/ *Mark K. Gyandoh*
Mark K. Gyandoh, Esq.